IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LAVERNE BALLARD,

      Plaintiff,

                                     CV. 09-873-PK

                                     OPINION AND ORDER

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF OREGON,
a public corporation, TRISTAR RISK
MANAGEMENT, INC., and JOHN FREE,

      Defendants.

_____

PAPAK, Judge:

      Plaintiff Laverne Ballard brings this employment discrimination action arising from her

employment with defendant Tri-County Metropolitan Transportation District of Oregon

("TriMet"). Although Ballard's complaint originally asserted nine different claims for relief, she

has abandoned four of those claims, leaving only claims for workers' compensation

discrimination under Or. Rev. Stat. § 659A.040, a state law tort claim for intentional infliction of

emotional distress (IIED), and three similar claims for racial discrimination under Title VII,

Page 1- OPINION AND ORDER

Section 1981, and Or. Rev. Stat. § 659A.030.  Ballard also stipulated to dismissal of defendant

TriStar Risk Management, Inc., leaving only TriMet and its workers' compensation manager

John Free as defendants in this action.  Now before the court is TriMet and John Free's motion

for summary judgment (#51) on all remaining claims, Ballard's amended motion for partial

summary judgment (#63) on her workers' compensation discrimination claim, and TriMet and

Free's motion for reconsideration (#95) of this court's prior opinion and order concerning the

return of privileged documents.[1]  Also before the court are various motions to strike raised

throughout the parties' briefing and at oral argument.  I have examined the parties' briefing and

have heard oral arguments in the matter.  For the following reasons, TriMet's motion (#51) for

summary judgment is granted in part and denied in part, Ballard's amended motion for partial

summary judgment (#63) is denied, and TriMet's motion for reconsideration (#95) is denied.


## BACKGROUND

This case involves the complex employment history of plaintiff Laverne Ballard, an

African-American woman who worked as a bus driver for TriMet until her termination in

November 2008.  Ballard allegedly suffered a series of workplace injuries, for which she filed

worker's compensation claims.  Although denied initially, her claims were ultimately approved

on appeal.  While she was injured, Ballard attempted to return to work in various ways, including

through light duty assignments, driving shorter shifts, and applying for non-driving positions

within TriMet.  Ballard was unsuccessful in securing other positions or resuming full-time

---

[1] For simplicity, I often refer to defendants TriMet and John Free collectively as TriMet when describing their briefing and arguments, since Free joins in all of TriMet's motions.

driving.  Ultimately, TriMet terminated Ballard for failing to work 30 days within a 12-month

period, as required by the continuity of service provisions in the applicable collective bargaining

agreement.  Ballard maintains that TriMet and John Free, TriMet's workers' compensation

manager, engaged in a concerted effort to deny Ballard opportunities to return to work in

retaliation for her invocation of workers' compensation rights and because of her race.  Thus, the

resolution of the pending motions depends crucially on understanding the intricacies of TriMet's

workers' compensation and human resources systems and examining how those systems

functioned in Ballard's case.

In 1997, Ballard was hired by TriMet as a "mini-run" bus operator.  (Toran Aff., #54, Ex.

3, at 1.)  By May 1998, she was promoted to the position of full time bus operator.  (Snyder

Decl., #66, Ex. 7, at 2.)  The main events pertinent to these motions commence in March 2005,

when Ballard filed the first of three relevant workers' compensation claims that underlie her

discrimination allegations.

## I.      First Claim: March 7, 2005

On March 9, 2005, Ballard filed a workers' compensation claim stating that two days

earlier, on March 7, 2005, she had injured her neck and left shoulder while on the job.  (Toran

Aff, #54, Ex. 7, at 2.)  Ballard reported that reaching to open doors, gripping the steering wheel,

and other repetitive motions caused the injury.  *Id.*  On March 11, 2005, Ballard started light duty

work, an alternative form of temporary work at TriMet not involving driving. (Toran Aff., #54,

Ex. 14 at 1, Ex. 66 at 8) ("lc" code at March 11, 2005, which stands for "Light Duty(full day)").

A month later, on April 6, 2005, Ballard's claim was initially denied.[2]  Ballard's workers'

compensation claim was ultimately approved on appeal some two years later.[3]  Before continuing

with the history of Ballard's workers' compensation claims, it will be helpful to discus the

various terms used by the parties to refer to work arrangements sought by Ballard that required

something less than full-time driving.

A.      **Light Duty**

TriMet policy HR-516.1 provides for "light duty," an "early return-to-work program" for

employees with pending or accepted workers' compensation claims to stay productive while they

heal from injuries.  (Toran Aff., #54, Ex. 5 at 1.)  Light duty assignments are limited to a

maximum of 60 days, or until medical opinion suggests that the employee's progress is

insufficient to return to regular employment, whichever is earlier.[4]  *Id.* at 2.  Becky Neill,

TriMet's light-duty coordinator, explained that TriMet typically offers light duty tasks such as

staffing the spotter shack, monitoring the Park & Ride lots, and bundling transfers. (Synder

---

[2] The parties disagree whether defendant John Free, TriMet's workers' compensation manager, or TriMet's third-party administrator denied the claim.

[3] A hearing was held before an administrative law judge (AJL), and on July 14, 2006, the ALJ found that Ballard suffered a compensable cervical strain as a result of her March 7, 2005 work activities, but that the remainder of Ballard's shoulder pain resulted from preexisting tendonitis and bursitis, and were therefore not compensable.  (Toran Aff., #54, Ex. 10, at 3-4.) Both Ballard and TriMet appealed, and on April 17, 2007, the Workers' Compensation Board determined that both the neck and shoulder injuries were compensable.  (Toran Aff., #54, Ex. 1.)

[4] TriMet characterizes the 60 days referenced in the policy as "calendar days," although the policy itself does explicitly include that modifier.  John Free, TriMet's worker's compensation manager, interpreted the policy to refer to calendar days based on TriMet's past practice. (Snyder Decl., #66, Ex. 4 at 42:18 - 43:20) (Free Deposition).  TriMet's assumption that light duty is measured by calendar days, not work days, may account for the discrepancy between the parties' calculations of the number of light duty days Ballard received.

Page 4- OPINION AND ORDER

Decl., #66, Ex. 91, at 22:25-25:15) (Neill deposition).  Light duty may be extended beyond 60

days by the light-duty coordinator if there is continued medical support of the employee's return

to regular work, objective and verifiable documentation of progressive improvement, and

availability of light duty tasks.  (Toran Aff., #54, Ex. 5 at 2.)  TriMet retains discretion over

whether to offer or continue light duty assignments.  *Id.* at 1.

TriMet asserts that in the month-long period between Ballard's first March 7, 2005

workers' compensation claim and her April 6, 2005 denial, Ballard worked 27 "light duty" days

under that claim.  (D.'s CSMF, #53, ¶9) (citing Ballard's December 27, 2010 Employee Absence

History without further explanation).  Ballard disputes TriMet's characterization of her absence

history form, contending that she worked only 14 "light duty" days between March 7, 2005 and

April 6, 2005.  (P.'s Resp. to CSMF, #100, ¶10) (also citing Ballard's December 27, 2010

Employee Absence History).  The parties similarly disagree about the number of light duty days

Ballard worked on her later workers' compensation claims.[5]

## B.    Modified Return to Work

In addition to "light duty" work offered pursuant to TriMet's policies, the collective

bargaining agreement between TriMet and the Amalgamated Transit Union know as the Working

and Wage Agreement ("WWA") apparently provides for a "modified return to work."  (Snyder

Decl., #66, Ex. 8, at 11-12) (WWA page 29).  The WWA allows an employee who is released by

_____

[5]TriMet contends that Ballard received 29 days of "light duty" in the period between the
filing of her second workers' compensation claim on December 23, 2005 and her denial on
February 28, 2006.  (D.'s CSMF, #53, ¶10.)  Ballard contests TriMet's light duty calculations for
the second claim, although it is not clear how many light duty days Ballard believes she was
granted.

her doctor to return to work on a limited basis to be assigned to available work that is consistent with the doctor's work release. *Id.* at 11.

TriMet (in briefing) and TriMet employees (in depositions) refer to Ballard as engaging in "light duty driving." (Toran Supp. Aff., #93, Ex. 75 at 3) (referencing Ballard's request to "return to a light-duty driving scenario"); (D.'s CSMF, #53, ¶12) ("Plaintiff also was permitted 122 days of light-duty driving"). It seems likely that these references to light duty driving actually constitute modified return to work as described in the WWA. As with "light duty" described above, the parties disagree about how many days of modified return to work Ballard performed in various periods.[6]

### C.    Alternative Work

Alternative work is another type of working arrangement described in the WWA's modified return to work provision. (Snyder Decl., #66, Ex. 8, at 11.) According to the WWA, when available alternative work assignments outpace the capacity of light duty employees who are injured on the job, TriMet attempts to assign employees who are not working due to "off-the-job" injuries to those alternative assignments. There is no indication that Ballard participated in alternative work; in fact, an arbitrator who reviewed the denial of Ballard's grievance for being taken off light duty noted that TriMet apparently had never implemented the alternative work provision of the WWA. (Toran Supp. Aff., #93, Ex. 81., at 2.)

## II.    Attendance Goals

---

[6] For example, between April 24, 2006 and May 19, 2006, TriMet contends Ballard worked 28 days of "light duty driving," while Ballard asserts that she performed only 14 days of "light duty" during that period. (D.'s CSMF, #53, ¶10); (P.'s Resp. to CSMF, #100, ¶10.)

In November 2005, while Ballard's first workers' compensation appeal was pending, TriMet initiated contact with Ballard in an effort to improve her attendance. On November 28, 2005, Ruth Tillson, an assistant station manager, noted that Ballard had not responded to her previous request to meet and develop attendance goals. (Snyder Decl., #66, Ex 14.) Since records showed that Ballard had "lost 540.50 hours during the last 12 months due to sickness or absence," Tillson set an attendance goal for Ballard: miss no more than 24 hours from November 29, 2005 through March 1, 2006. *Id.*

## III.     Second Claim: December 23, 2005

Ballard filed a second workers' compensation claim for an injury to her leg, lower back, and hip she allegedly suffered while using her foot to extend a malfunctioning wheelchair lift. (Toran Aff., #54, Ex. 8, at 2.) Ballard went to the emergency room at Providence Medical Center on December 30, 2005, where Dr. Mark Sutherland diagnosed her with "lumbar strain with sciatica." (Toran Aff., #54, Ex. 16 at 2)(Workers' Compensation Board hearing opinion). She continued to seek treatment from several medical providers in December 2005 through February 2006. *Id.* at 1-3. Ballard's attending physician Dr. Gerry ordered Ballard off work until January 23, 2006, then released her to light duty with lifting and driving restrictions. (Lloyd Decl., #87, Ex. 6, at 1.)

While Ballard's second claim was awaiting an initial decision and her first claim was on appeal, TriMet continued to address Ballard's "time loss." On February 24, 2006, Shelly Lomax, Senior Station Manager, wrote Ballard informing her that she had missed 24.81 hours since November 29, 2005 and 541.87 hours in the past 12 months. (Snyder Decl., #66, Ex 18.) Lomax requested a meeting to discuss Ballard's performance and warned that she would set attendance

standards in Ballard's absence if she failed to meet.  *Id.*

On February 28, 2006, Sedwick Claims Management Services denied Ballard's second claim, apparently as a third party administrator on behalf of TriMet.  (Toran Aff., #54, Ex. 15, at 1.)  The same day, John Free emailed Lomax stating: "We denied [Ballard's] claim today so let's not do anything unless she comes back into LD [light duty] and tries to pull the same thing again. I'll keep copies of the issues we had with her this time." (Lloyd Decl., #87, Ex. 22.)  Ballard appealed her denial and was ultimately successful.[7]  On March 7, 2006, Dr. Gerry released Ballard to light duty driving.  (Lloyd Decl., #87, Ex. 6, at 1.)  The same day, Ballard filed a grievance over being taken off a light duty job when her workers' compensation claim was denied.[8]  (Snyder Decl., #66, Ex. 20); (Toran Supp. Aff., #93, Ex. 81, at 1.)

An independent medical examination conducted for insurance purposes on March 21, 2006 concluded that Ballard's subjective complaints could not be substantiated.  (Toran Aff., #54, Ex. 16 at 3.)  On April 19, 2006, Dr. Gerry released Ballard to "regular duty" consisting of eight hours a day.  (Lloyd Decl., #87, Ex. 6, at 2.)  On April 25, 2006, Dr. Gerry ordered Ballard to work only six hours a day on regular duty.  *Id.*  Finally, on May 23, 2006, Dr. Gerry again released Ballard to "regular duty."  *Id.*

_____

[7] A year and a half later, on September 19, 2007, an administrative law judge set aside the denial of Ballard's claim, finding her lumbar strain compensable.  (Toran Aff., #54, Ex. 16, at 8-9.)  TriMet sought review, and the ALJ's decision was affirmed.  (Toran Aff., #54, Ex. 17.)

[8] The grievance was ultimately denied by an arbitrator.  *Id.*  He reasoned that since Ballard's workers' compensation claim had been denied at the time of her grievance, she was deemed to be injured off-the-job, and therefore, she was only eligible for Alternate Work Assignments as described in the WWA, not light duty work.  *Id.* at 2. Because TriMet had not implemented the provision of the WWA for Alternate Work Assignments and because such services were discretionary, Ballard was not entitled to such work.  *Id.*

On September 14, 2006, Lomax sent another letter telling Ballard that she was required to meet within seven days of her return to work, otherwise a course of disciplinary action would be established without Ballard's input. (Snyder Decl., #66, Ex. 21.) On November 13, 2006 Ballard was released to work and completed a "Return to Work" operator evaluation. (Snyder Decl., #66, Exs. 22,23.)

On December 11, 2006, Free emailed a claims adjuster at TriStar regarding Ballard, stating: "I have asked Travis [Terrall, attorney for TriStar and TriMet] to offer a global as this 38 year old woman will cost us a fortune in the future and she will be vested for retirement April 27, 2007. . . . this lady's best year for attendance since 1999 is she 'only' missed 38 days of work one year but has averaged 87 missed days per year since 1999, this is her 4th claim and she has milked the last two for all they are worth." (Snyder Decl., #54, Ex. 22.)

## IV.   Third Claim: February 2, 2007

Ballard filed a third workers' compensation claim alleging that she suffered multiple injuries on February 2, 2007, after being forced to brake quickly and change lanes to avoid a car that had run a stop sign. (Toran Aff., #54, Ex. 9, at 2.) On February 7, 2007, Ballard sought treatment from Dr. Fish, a chiropractor, who diagnosed thoracic and rib strains attributable to the incident. (Snyder Decl., #66, Ex. 25 at 7) (ALJ opinion). Between February 7, 2007 and March 12, 2007, Ballard worked some amount of light duty; TriMet contends she received 33 light duty days, while Ballard asserts she worked 23 light duty days. (Toran Aff. #54, Ex. 14) (cited by both parties). On March 22, 2007, TriMet offered Ballard a new light duty assignment bundling transfers, but Ballard's physician would not authorize Ballard to engage in that work because it involved frequent reaching. (Toran Aff., #54, Ex. 20.) On April 2, 2007, TriStar Risk

Management, TriMet's third party administrator, denied Ballard's claim. (Toran Aff., #54, Ex. 18, at 1.) Ballard appealed the denial and, over the course of the next two years, she prevailed both before an ALJ and before the Workers' Compensation Board.[9] Also on April 2, 2007, Ballard's doctor released her to do spotting, another light duty assignment, but the next day TriMet notified Ballard she was no longer eligible for that assignment, since her workers' compensation claim had been denied. (Lloyd Decl., #87, Exs. 7, 8.)

On June 4, 2007, a TriMet employee emailed John Free and others notifying them that Ballard's doctor had apparently cleared her for a return to regular duty, but that Ballard had "marked off" the next day. (Snyder Decl., #66, Ex. 28.) Free instructed assistant manager Ruth Tillson to check with Ballard about her situation. *Id.* Ballard told Tillson she had suffered an aggravation of the injury that formed the basis of her first workers' compensation claim (the shoulder injury), which by that time, had been found compensable on appeal. *Id.* Free then instructed Tillson to have Ballard fill out an "aggravation form" listing the original date of injury. *Id.* On June 6, 2007, Ballard's doctor placed her off work until June 11, 2007, and then on "light duty" for two more weeks.[10] (Snyder Decl., #66, Ex. 31.) Starting on June 13, 2007 Ballard resumed light duty work, which she continued through July 23, 2007. (Snyder Decl., #66, Ex. 34.) On June 14, 2007, TriMet mailed Ballard a "TriMet Report of Aggravation Form." (Snyder Decl., #66, Ex. 30.)

---

[9] On July 11, 2008, the ALJ found Ballard's injury compensable. (Snyder Decl., #66, Ex. 25.) On March 3, 2009, the Workers' Compensation Board affirmed the ALJ's order. (Snyder Decl., #66, Ex. 26.)

[10] He continued to restrict Ballard to light duty on June 25, 2007, July 17, 2007, and August 13, 2007.

V.    **Applications for Non-Driving Positions**

In June 2007, Ballard began applying for non-driving positions within TriMet.  On June

21, 2007, Ballard applied for the Station Agent position.  (Toran Aff., #54, Ex. 36.)  On July 9,

2007, a TriMet human resources representative responded to Ballard's application, informing her

that she could not be considered for the position because her work history review revealed that

she had 978 hours of time loss during the past 12 months, well over the 110 hour maximum.

(Toran Aff., #54, Ex. 38.)  Ballard disputes the accuracy of these time loss calculations, asserting

her absence history shows that TriMet improperly included hours coded as "c" or "workers

comp."

VI.    **Light Duty Eligibility Ends**

On July 17, 2007, Ballard's station manager held a mandatory meeting with Ballard to

discuss her light duty assignments.  (Snyder Decl., #66, Exs. 37,38.)  During that meeting,

Ballard reports that TriMet workers' compensation manager John Free told her that she was a

"grown woman" and that she should not need to be told that she was "expected to work."

(Ballard Decl., #65, ¶5.)  The same day, Becky Neill, TriMet's light duty coordinator, informed

Ballard that her eligibility for the light duty program would end one week later on July 23, 2007.

(Snyder Decl., #66, Ex. 38.)

VII.    **Additional Unsuccessful Applications**

Between August 31, 2007 and September 12, 2008, Ballard applied for six other non-

driving positions at TriMet.  In most cases, TriMet determined that Ballard's time loss

disqualified her from consideration.  On August 31, 2007, Ballard applied for a Bus Supervisor

position and on October 12, 2007, she was disqualified due to excessive time loss. (Toran Aff.,

#54, Ex. 39.)

After Ballard expressed concerns about the calculation of her time loss, TriMet human resources representative Jean Brown conducted a second work review on October 25, 2007 to determine which of Ballard's absences were for workers' compensation or other leave, and which were properly included in work loss totals for Ballard's Bus Supervisor and Station Agent applications. (Brown Decl., #55, ¶5.) Brown relied on the calculations of an outside auditor and also examined payments to Ballard indicating certain absences related to workers' compensation, based on Ballard's successful appeals. *Id.* at ¶7. Brown found that Ballard had 183.9 work loss hours for purposes of her Bus Supervisor position and 191.9 hours for the Station Agent position, both of which exceeded 110 hour maximum.[11] *Id.* at ¶¶4,7. In a declaration, Brown explains the method for calculating time loss, including application of the "push back" period, which readjusts the relevant 12 month review period backward by the number of absences attributable to workers' compensation, so long as the absences occurred in blocks of at least five days. *Id.* at ¶4.

On October 26, 2007, Ballard underwent a Physical Capacity Evaluation (PCE) with Laurence Andes, PT, who opined that Ballard "would not be capable of working full time and on a consistent basis as a bus driver." (Snyder Decl., #66, Ex. 42.)

On November 13, 2007, John Free emailed Becky Neill recounting a conversation he had with Ballard where Free explained that Ballard had exhausted her light duty time and that if she could no longer drive a bus, she would have to apply for other non-driving positions. (Snyder

---

[11] Ballard disputes the accuracy of these calculations, arguing that they conflict with Ballard's work absence history form from December 27, 2010. (Toran Aff., #54, Ex. 14.)

Decl., #54, Ex. 45.)  Ballard insisted that she could still drive, even though her PCE said that she

could not.  *Id.*  Free commented to Neill that "[i]f the PCE said she cannot drive again I want to

run with that and make sure she does not ever drive again."  *Id.*

     On February 1, 2008, Ballard applied for the Fare Inspector position, but that position

was suspended without being filled.  (Toran Aff., #54, Exs. 40,41.)   In addition to applying for

alternative positions with TriMet, between January 18, 2008 and May 12, 2008 Ballard sent a

number of letters to Station Agent Mickey Young requesting to return to light duty work or work

consistent with her doctor's restrictions.  (Ballard Decl., #65, Exs. 4-14.)

## VIII.    Confusion about Time Loss Calculations

     In the midst of Ballard's various job applications, TriMet staff expressed confusion about

how to properly calculate Ballard's time loss.  For example, on April 8, 2008, Employee Services

Director Lucy Shipley emailed John Free to ask for help "cleaning" Ballard's time loss record.

(Lloyd Decl., #87, Ex. 38.)

## IX.    Attempted Return to Work

     On April 14, 2008, Dr. Gerry deemed Ballard healthy enough to resume working a

morning shift, consisting of three hours for five days per week, with the rest of the shift being

light duty.  (Toran Aff., #54, Ex. 57.)  On May 6, 2008, Ballard met with Mickey Young and

TriMet human resources staff and voiced her desire to return to work as a bus operator.  (Toran

Aff., #54, Ex. 58.)   On May 12, 2008, Young sent Ballard a letter requiring, as a prerequisite to

returning to work, that Ballard have her doctor provide a timeline projecting when she would be

able to return to her regular driving schedule.[12] *Id.*  The next day, Dr. Gerry reiterated that Ballard

---

[12] Young later described this process as "work hardening."  (Toran Aff., #54, Ex. 58.)

could drive for three hours per day for a four week period.  (Toran Aff., #54, Ex. 57.)  Then, on

May 16, 2008, Young accepted Ballard's limited driving schedule, but required her to provide

further verification from her doctor after four weeks indicating that she could increase her hours

and progress towards a regular work schedule.  (Toran Aff., #54, Ex. 58.)  On May 21, 2008,

Ballard completed a required Return to Work Refresher.  (Snyder Decl., #66, Ex. 52.)  It is

unclear to what extent Ballard worked the three-hour shifts as envisioned.

## X.    Aggravation Claim

On June 5, 2008,  Ballard visited Dr. Jeffreys Albright, a physician she had no seen

previously, for treatment of an aggravation of her left shoulder injury.  Dr. Albright advised

Ballard to observe her previous restrictions and additionally restricted her from driving 1700 and

1800 series buses.  (Snyder Decl., #66, Ex. 54.)  Ballard asserts that she also signed and

submitted an "827" workers' compensation form used to initiate a workers' compensation

aggravation claim that same day.   (Ballard Decl., #65, ¶3.)  On June 17, 2008, Dr. Albright

certified that Ballard was off work from June 11th through June 17th due to a left shoulder

aggravation.  (Snyder Decl., #66, Ex. 56.)

On June 19, 2008, Mickey Young informed Ballard that she would have to undergo a

complete physical examination with Dr. James Harris, TriMet's consulting physician, by June 30,

2008.  The purpose of the examination was to determine whether Ballard could safely return to

work, since she had apparently aggravated the injury to her left shoulder that her doctor had

previously concluded would permanently prevent her from returning to work as a bus operator.[13]

---

[13] It seems that this medical review was initiated as part of the "Third Doctor Opinion
Process," a procedure outlined in a part of the collective bargaining agreement not reproduced in
the record.  A letter from the union to TriMet on July 24, 2008 clarifies that TriMet had invoked

(Toran Aff., #54, Ex. 60.)  TriMet placed Ballard on paid administrative leave until she

completed an evaluation with Dr. Harris.  *Id.*  On June 30, 2008, Dr. Albright signed Ballard's

"827" form.  (Toran Aff., #54, Ex. 12.)  Ballard failed to schedule an examination with Dr. Harris

by June 30, 2008 and TriMet suspended her administrative pay.  (Toran Aff., #54, Ex. 61.)

Despite Ballard's apparent submission of an 827 form, TriMet was unaware that Ballard

had filed an aggravation workers' compensation claim.[14] In a letter dated July 18, 2008 to

Ballard's union, TriMet human resources director wrote that "[b]ased on the information

provided by Ms Ballard, this [complaint of left shoulder aggravation] is not a workers'

compensation claim since Ms. Ballard has not filed the required 801 or 827 forms."  (Snyder

Decl., #66, Ex. 66.)  Indeed, TriStar, TriMet's third party administrator, first received Ballard's

827 form on July 25, 2008. (Toran Aff., #54, Ex. 12) (timestamp).  Moreover, John Free

expressed concern about the fact that TriMet did not receive a copy of Ballard's 827 form until

August 8, 2008.  (Snyder Decl., #66, Ex. 68, at 1.)  TriStar ultimately denied Ballard's claim on

September 22, 2008.  (Snyder Decl., #66, Ex. 67.)

## XI.    More Applications

On July 25, 2008, Ballard applied for a Customer Service Representative position, but

failed the work record review, likely because of time loss.  (Toran Aff., #54, Ex. 42); (Lloyd

---

the "3rd Doctor Procedure" and that Dr. Harris would be evaluating Ballard to determine whether
her shoulder had improved enough for her to return to work. (Lloyd Decl., #87, Ex. 45.)  It also
appears, however, that Dr. Harris was not the "third doctor" envisioned by this policy. To
confuse matters further, other communications from TriMet suggest that the third doctor opinion
process was either never initiated or never completed.  (Lloyd Decl., #87, Ex. 48.)

[14] Ballard asserts that had TriMetprocessed Ballard's aggravation claim in a timely
manner, she would have been eligible for an additional 60 days of light duty work under TriMet's
light duty policy while her claim was pending.  Ballard received no such light duty work.

Decl.,#87, Ex. 14.)  On July 31, 2008, Ballard applied for the position of Light Rail Vehicle

Operator, but she was not considered for the position because TriMet human resources believed

Ballard's shoulder injury aggravation prevented her from fulfilling the job requirements, which

included significant demands on the arms and shoulders.  (Toran Aff., #54, Exs. 43,44.)

## XII.    Medical Examination

On August 4, 2008, Dr. Harris finally examined Ballard.  (Snyder Decl., #66, Ex. 72.)

Dr. Harris opined that "it is not medically reasonable for Ms. Ballard to return to the position of

bus operator at this time" because of the possibility that she would re-injure her shoulder while

operating the steering wheel and because her symptoms might prevent her from forcibly turning

the wheel in an avoidance maneuver, compromising her ability to drive safely.  *Id.*  Dr. Harris

concluded that Ballard did not "ma[ke] a substantial recovery from her injury" and advised that

she find non-driving work.  *Id.*  After being asked by Ballard to opine about her capacity for light

duty work, Dr. Harris stated that there was "no medical reason why Ms. Ballard can not [sic]

perform non-driving duties at TriMet that are consistent with her work restrictions from her

treating physician."  (Snyder Decl., #66, Ex. 74.)

## XIII.    Further Applications

On September 5, 2008, Ballard applied for the position of Station Agent, but was denied

because her work record review indicated she had 406 hours of time loss.  (Toran Aff., #54, Ex.

45.)  On September 12, 2008, Ballard applied for the position of Dispatcher, but her application

apparently was never entered into TriMet's system.  (Toran Aff., #54, Ex. 46); (Brown Aff., #55,

at 3).

## XIV.    Attempted Return to Work

Page 16- OPINION AND ORDER

On September 17, 2008, Dr. Albright wrote another note stating that Ballard could return to the morning portion of her route and work light duty for the remainder of her shift.  (Snyder Decl., #66, Ex. 78.)  On September 23rd, 2008, TriMet's Mickey Young acknowledged Dr. Albright's note, but refused to allow Ballard to return to work because her workers' compensation claim was still unresolved and because the third doctor review process had been suspended pending resolution of her workers' compensation aggravation claim.[15]  (Lloyd Decl., #87, Ex. 46.)

## XV.    Notice

On October 17, 2008, TriMet sent Ballard's union a 30-day notice letter stating that if Ballard failed to return to work on or before November 17, 2008 and complete 30 calendar days in her regular work assignment, her employment would be terminated.  (Snyder Decl., #66, Ex. 80.)

## XVI.    Release to Full-Time Driving

On October 22, 2008, Dr. Albright indicated that Ballard could return to "regular work" on October 24, 2008 as long as she did not drive 1700 or 1800 series buses and did not lift more than 15 pounds.  (Snyder Decl., #66, Ex. 81.)  Ballard provided TriMet with Dr. Albright's note the next day.  (Snyder Decl., #66, Ex. 82.)  TriMet's Mickey Young responded that, in order for TriMet to evaluate Dr. Albright's medical release, Ballard had to be examined again by Dr. Harris on October 27, 2008.  *Id.*  At that examination, Dr. Harris found that because of Ballard's limited motion in her left shoulder, it would be unsafe to allow her to drive a bus.  (Snyder Decl.,

---

[15] In fact, the day before Young's letter, TriStar had denied Ballard's workers' compensation aggravation claim.  (Snyder Decl., #66, Ex. 67.)

#66, Ex. 83).  On November 3, 2008, TriMet contacted Ballard to report that since Dr. Harris

(TriMet's physician) and Dr. Albright (Ballard's physician) disagreed on whether Ballard could

return to work as a bus operator, TriMet would request selection of a third doctor for a binding

opinion.[16]  (Snyder Decl., #66, Ex. 84.)

## XVII.  Termination

On November 18, 2008, TriMet supervisor Hayden Talbot sent Ballard a notice of

termination stating that because Ballard failed to work 30 calendar days in her regular

assignment, she would be terminated pursuant to the continuity of service provision in the

collective bargaining agreement, which required termination of an employee who cannot work

for more than a year because of injury or illness.  (Snyder Decl., #66, Ex. 85.)  Ballard's

personnel order dated the same day stated that she was ineligible for rehire.  (Snyder Decl., #66,

Ex. 86.)  Following her termination, Ballard apparently filed a grievance that has now been

stayed pending resolution of this suit.


## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues

exist for trial.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

---

[16] It appears that no third doctor was ever selected.

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial.  *Liberty Lobby*, 477 U.S. at 249;  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains.  *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial.  *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby*, 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045.

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other.  *See* Fed. R. Civ. P. 56; *see also*, *e.g.*, *Fair Hous. Council v. Riverside*

*Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## DISCUSSION

### I.    TriMet and Free's Motion for Summary Judgment

TriMet and Free move for summary judgment on all of Ballard's claims for relief, arguing

that some of Ballard's claims are barred by applicable timing requirements and that all of

Ballard's claims that are timely otherwise fail for lack of supporting evidence.

### A.    Timing

Several separate timing requirements limit the scope of Ballard's claims: the federal

exhaustion requirement for Title VII claims; the state exhaustion requirement; the state statute of

limitations; and the Oregon Tort Claims Act notice requirement.  Fortunately, the parties agree

on the impact of the first three of these timing requirements.  First, the parties concur that

because of federal exhaustion requirements, any conduct occurring more than 300 days before

Ballard's filing of her first EEOC complaint on May 9, 2008 (i.e. before July 14, 2007) is not

actionable under Title VII.  *See Surrell v. California Water Service Co.*, 518 F.3d 1097, 1103

(9th Cir. 2008).  Moreover, since Ballard filed her second EEOC complaint on March 30, 2009,

any conduct occurring in the period between May 9, 2008 and June 3, 2008 (300 days prior to the

second EEOC complaint) is similarly not actionable under Title VII.  Second, the parties agree

that under Or. Rev. Stat. § 659A.875(6), state unlawful employment practices suits must be

commenced either within one year after the practice occurred, or, if a BOLI complaint has been

filed, "no later than one year after the alleged unlawful practice."  Or. Rev. Stat. § 659A.820.

Thus, there is no dispute that acts occurring before May 5, 2007, one year prior to Ballard's filing

Page 20- OPINION AND ORDER

of her first BOLI complaint, may not form the basis for her state law employment discrimination

claims.  Third, the parties agree that since the Oregon Tort Claims Act imposes a two-year statute

of limitations, Or. Rev. Stat. § 30.275(9), any conduct occurring before July 28, 2007 (two years

before the commencement of this suit) may not form the basis for any tort claim.

The major dispute, however, concerns the notice requirement of the Oregon Tort Claims

Act (OTCA).  The OTCA requires plaintiffs to give notice of intent to file a state law claim

against a public body within 180 after the alleged injury.  Or. Rev. Stat. § 30.275(2)(b);

§659A.875(5) (notice requirement also applies to statutory employment claims).  TriMet

received Ballard's first OTCA notice on March 31, 2008 alleging, among other things, workers'

compensation discrimination and failure to provide light duty work. (Toran Aff, #54, Ex. 29.)

180 days prior to that date is October 3, 2007.   Thus, both parties agree that conduct occurring

*before* October 3, 2007 cannot form the basis of any of Ballard's state law claims.   TriMet

received Ballard's second OTCA notice on April 16, 2009, alleging wrongful termination.

(Toran Aff, #54, Ex. 31.)  180 days prior to that date is October 18, 2008.   Therefore, TriMet

argues that Ballard is barred from bringing a state law claim based on conduct occurring after

March 31, 2008 (when TriMet received her first OTCA notice) but before October 18, 2008 (180

days before her second OTCA notice).[17]  Ballard, however, contends that her first OTCA notice

and her BOLI complaints provided TriMet notice of the later allegedly illegal conduct occurring

during this "gap" because these documents described a *continuing* course of discrimination and

retaliation involving substantially similar conduct.  *See Barns v. City of Eugene*, 183 Or. App.

---

[17] TriMet refers to this as the "gap" in coverage.

471, 475, 52 P.3d 1094 (2002) ( "When a continuing tort is involved, a notice of claim filed at

any time during the continuance of the conduct or within 180 days after the conduct has ceased is

timely." ) TriMet counters that the continuing violation doctrine is not applicable because

Ballard's state law claims allege discrete incidents of workers compensation discrimination, race

discrimination and intentional infliction of emotional distress.

> As this court has previously explained:

> The Supreme Court . . . has limited the reach of the continuing violations doctrine,
> holding that "discrete discriminatory acts are not actionable if time barred, even when
> they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v.
> Morgan*, 536 U.S. 101, 113 (2002). A discrete act is an incident of discrimination, "such
> as termination, failure to promote, denial of transfer, or refusal to hire," that constitutes a
> separate, actionable "unlawful employment practice." *Id.* at 114. In contrast, the
> continuing violation doctrine applies to hostile work environment claims, which by their
> nature consists of multiple related actions that by themselves may not constitute
> discrimination. *Id.* at 122; *see also Lyons v. England*, 307 F.3d 1092, 1107(9th Cir.
> 2002) ("If a plaintiff chooses to bring separate claims based on each discriminatory act,
> his assertion that this series of discrete acts flows from a company-wide, or systematic,
> discriminatory practice will not succeed in establishing the employer's liability for acts
> occurring outside the limitations period.") Oregon courts draw a similar distinction
> between discrete acts of discrimination and a systematic pattern of conduct. *BoardMaster
> Corp. v. Jackson County*, 224 Or. App. 533, 551, 198 P.3d 454 (2008); *see also Davis v.
> Bostick*, 282 Or. 667, 674, 580 P.2d 544 (1978) (where evidence showed that plaintiff
> was harmed by each individual alleged wrongful act, she was not "entitled to ride out the
> storm and lump sum her grievances").

*Arbigon v. Multnomah County*, 2010 WL 2038839, at *14 (D. Or. May 20, 2010). Under

Oregon law, a continuing tort is characterized by acts which "are not the type of discrete,

permanent events that would likely support separate actions for wrongful discrimination" but,

rather, separate incidents that "can be reasonably construed as elements of a systematic pattern of

conduct, aimed at causing plaintiff's eventual termination." *Griffin v. Tri-Met*, 112 Ore. App

575, 581-82, 831 P.2d 42 (1992), *aff'd in part and rev'd in part on other grounds*, 318 Or. 500,

Page 22- OPINION AND ORDER

870 P.2d 808 (1994) (actions allegedly placing "extraneous stress" on plaintiff in the work

environment– such as reprimanding, threatening suspension and discharge, and demanding

releases of information for medical records– constituted a continuing tort).  In sum, "at the heart

of the continuing tort idea is the concept that recovery is for the cumulative effect of wrongful

behavior, not for discrete elements of that conduct." *Davis v. Bostick*, 282 Or. 667, 671, 580 P.2d

547 (1978).

Here, none of Ballard's allegations meet the definition of a continuing tort under either

Oregon or federal law.  *See Atwood v. Or. DOT*, No. CV-06-1726-ST, 2008 U.S. Dist. LEXIS

22369, at *36 (D. Or. Mar. 20, 2008) ("the continuing violation doctrine under federal law

appears perfectly congruous with the lines drawn between continuous torts and separate discrete

acts under Oregon law.").  Ballard's complaint alleges five different types of discriminatory

conduct underlying her worker's compensation discrimination, race discrimination, and IIED

claims: (1) denying light duty and/or modified duty work; (2) placing her on attendance goals; (3)

denying her applications for other positions at TriMet; (4) rejecting physician work releases and

requiring physical examinations; and (5) terminating her seniority and employment.  (Compl., #1,

¶110.)  Some of Ballard's allegations describe discriminatory conduct explicitly identified by the

United States Supreme Court as the type of discrete act which falls outside the scope of the

continuing violation doctrine.  These include denying Ballard's applications for other TriMet

positions, terminating Ballard's seniority and employment, and designating Ballard as ineligible

for rehire.  Other of Ballard's allegations describe conduct which can be characterized as separate

adverse employment actions even though they were not ultimate employment decisions like

Page 23- OPINION AND ORDER

termination or refusal to hire.[18]  *See Delacruz v. Tripler Army Med.*, 507 F. Supp. 2d 1117, 1124 (D. Haw. 2007) (implying that adverse employment actions include any conduct having a "negative impact on [the plaintiff's] compensation, hours, status, or other terms of employment.").  These include denying Ballard light duty or modified duty work, placing Ballard on attendance goals, and rejecting Ballard's physicians' work releases and requests for reinstatement.  *See Barrett v. Marion Cnty.*,No. 07-6337-TC, 2008 U.S. Dist. LEXIS 69629, at *14 (D. Or. Sept. 15, 2008) ("refusal to grant accommodations and retaliation events are discrete, separately actionable claims" not parts of a continuing tort).  None of Ballard's allegations resemble those of the plaintiff in *Griffin*, involving creation of a hostile work environment through an ongoing accumulation of harassing conduct.  *See also Atwood v. Or. DOT*, No. CV-06-1726-ST, 2008 U.S. Dist. LEXIS 22369, at *36 (D. Or. Mar. 20, 2008) ("a hostile work environment claim seems to be exactly the kind of claim which 'recovery is for the cumulative effect of wrongful behavior.'").

Ballard contends that her first OTCA notice and her BOLI complaint satisfied the "intent" of the OTCA notice requirement by putting TriMet on notice of Ballard's claims and allowing TriMet to investigate and respond to them in administrative proceedings.  *See Flug v. Univ. of Or.*, 13 P.3d 544, 551 (Or. Ct. App. 2000) ("The purpose of the notice requirement of ORS 30.275 is to allow the public body an opportunity to investigate a matter promptly and to settle all meritorious claims without litigation.").  In essence, Ballard argues that her initial OTCA notice raised the continued use of her workers' compensation claims as a "negative factor" in multiple

---

[18] Indeed, Ballard argues later in her briefing that these acts constitute separate adverse employment actions for the purpose of her workers' compensation discrimination claims.

employment decisions, which persisted even beyond that initial notice. Ballard's argument is

plausible on its face; it would seem onerous to force a plaintiff to file a new OTCA notice each

time her employer takes a new adverse action based on the same underlying discriminatory

assumption. Nevertheless, plaintiff cites no cases, and I find none, where Oregon or federal

courts have relied on the "intent" behind the OTCA to permit claims for discrete employment

actions which occurred outside the notice period, but were similarly motivated. Consequently, I

find TriMet's detailed analysis of the timeliness of Ballard's individual allegations to be

persuasive. (D.'s Br., # 62, at 8-13.) Accordingly, I briefly discuss the effect of various

limitations periods on each of Ballard's allegations. It is important to note that even though

timing limitations may not permit certain acts to be considered independently as adverse

employment actions giving rise to damages, time-barred conduct may still provide background

evidence for timely claims. *National Rail Passenger Corp. v. Morgan*, 536 U.S. 101, 113

(2002).

### 1.    Light Duty

None of Ballard's allegations concerning denial of light duty work occurred within the

period covered by Ballard's OTCA notices, and thus, cannot form the basis for her state law

discrimination and tort claims. Moreover, Ballard's Title VII claims may only be based on the

light duty allegations from April 14, 2008, June 5, 2008, June 17, 2008, and September 17, 2008.

(Compl., #1, ¶¶73, 79, 80, 96.) There are no timing concerns with Ballard's Section 1981

claims.

### 2.    Attendance Goals

None of Ballard's allegations regarding attendance goals are actionable, since they

Page 25- OPINION AND ORDER

occurred in November 2005 and February 2006, well before the initial OTCA notice period

beginning on October 3, 2007.

### 3.    Applications for Non-Driving Positions

The only application-related allegations occurring within the OTCA notice period are for

Ballard's disqualification from the bus supervisor position (October 12, 2007) and the fare

inspector position (application on February 1, 2008, but job closed without hiring any

applicants).   Thus, only those positions may form the basis of state law claims.  For the purposes

of Title VII, all application-related allegations except the station agent position (disqualified July

9, 2009) fall within the notice period.

### 4.    Rejection of Work Releases, Required Physical Examinations, and Failure to Reinstate

Allegations concerning Ballard's first required examination (required on June 19, 2008

and performed on August 4, 2008) fall outside the OTCA notice periods and are thus barred for

state law claims.  TriMet's failure to reinstate Ballard following Dr. Albright's October 22, 2008

release and TriMet's subsequent requirement of a second medical examination occurred within

the second notice period and are thus actionable under state law.  These events also fall within

the federal exhaustion time requirements for Title VII claims.

### 5.    Termination

There are no timing limitations affecting Ballard's allegation concerning her termination

on November 18, 2008.

### B.    Substantive Evidence

### 1.    Workers' Compensation Discrimination Claim

Page 26- OPINION AND ORDER

Ballard offers three overarching theories of workers' compensation discrimination.  The first theory, articulated by Ballard's complaint and summary judgment briefing, posits that TriMet engaged in five independent adverse employment actions, each of which was either directly or indirectly tainted by Free's hostility towards Ballard's based on her invocation of workers' compensation laws.[19]  The second theory, offered prominently at oral argument, is that John Free's initial denial of Ballard's several workers' compensation claims in combination with his and other TriMet employees' subsequent manipulation of discretionary TriMet policies caused a "domino" effect that inevitably resulted in her termination.[20]  The third theory, raised for

_____

[19]  I refer to each of these adverse actions as separate "allegations," attempting to mirror Ballard's complaint, which alleges TriMet discriminated against her based on her participation in the workers' compensation system by: (1) "denying her light and/or modified duty work;" (2) "placing her on Attendance Goals;" (3) "denying her applications for other positions with TriMet for which she was otherwise qualified;" (4) "rejecting the work releases provided by her treating physicians and requiring her to undergo a complete physical with TriMet's consulting physician, Dr. Harris;" and (5) "by terminating her seniority and employment with TriMet and deeming her ineligible for rehire." (Compl., #1, ¶121.)

[20]  I paraphrase the sequence of the falling "dominos" as follows: (1) Ballard suffers a workplace injury and files a workers' compensation claim; (2) Free's denial of Ballard's worker's compensation claim disqualifies her from light duty work; (3) Because Ballard asserts that her injury occurred on the job, she is also ineligible for what she describes as "modified duty" work; (4) Lacking any alternative means of supporting herself, Ballard must exhaust her accrued leave and ultimately take unexcused absences from work, which are tallied as "time loss;" (5) Even though Ballard has appealed the denial of her workers' compensation claim, her workers' compensation injury-related absences are still counted as time loss and she is disqualified from applications for other non-driving positions at TriMet; (6) Even after her appeals are granted, TriMet fails to change her attendance records to reflect that her absences were not time loss; (7) Unable to work in a non-driving position, Ballard attempts to return to part-time driving, as her health allows, but TriMet requires her to demonstrate her ability to return to full-time driving before starting part-time driving; (8) After Ballard aggravates her shoulder injury, TriMet requires her to prove that she can safely operate a bus before returning to part-time driving; (9) When Ballard's doctor certifies that she can return work, first part-time and then full-time, she is barred from work until TriMet's own doctor certifies that she is safe to drive; (10) After TriMet's doctor determined Ballard is unsafe to drive, Ballard remains barred

Page 27- OPINION AND ORDER

the first time at oral argument in response to the court's questioning, proposes that TriMet's

various policies discriminate against injured employees who seek workers' compensation.  I

shape much of my analysis to fit Ballard's first theory, since it more easily addresses the

elements a plaintiff must demonstrate under Oregon's workers' compensation discrimination

statute.  I discuss Ballard's second theory in the context of her termination allegation.  I decline

to address Ballard's third theory now, since it implicates pure questions of law that have not been

properly presented by either party.  Overall, I find that Ballard presents enough evidence to

advance to the jury and seek damages independently on each of the workers' compensation

discrimination allegations that are timely.

### 2.    General Standards

Oregon's workers' compensation discrimination statute provides:

> It is an unlawful employment practice for an employer to discriminate against a worker
> with respect to hire or tenure or any term or condition of employment because the worker
> has applied for benefits or invoked or utilized the procedures provided for in ORS chapter
> 656 or has given testimony under the provisions of those laws.

Or. Rev. Stat. § 659A.040(1).  This court recently described the proof structure for Oregon

workers' compensation discrimination claims as follows:

> To establish a prima facie case under ORS 659A.040, plaintiff must show that he (1)
> invoked the workers' compensation system; (2) was discriminated against in the tenure,
> terms or conditions of employment; and (3) that the employer discriminated against the
> plaintiff in the tenure or terms of employment because he invoked the workers'
> compensation system. *Kirkwood v. Western Hyway Oil Co.*, 204 Or.App. 287, 293, 129
> P.3d 726 (2006) (citing *Hardie v. Legacy Health System*, 167 Or.App. 425, 433, 6 P.3d

---

from work until a third doctor resolves the disagreement between her physician and TriMet's
physician; (11) After being prevented from moving to a non-driving assignment or returning to
her regular driving schedule, TriMet terminates Ballard under a policy requiring her to work 30
days in her regular position.

Page 28- OPINION AND ORDER

531, 537 (2000)).

This court applies the burden shifting analysis of *McDonnell Douglas* for claims brought under ORS 659A. *Snead v. Metropolitan Property & Casualty Insurance*, 237 F.3d 1080, 1090-94 (9th Cir. 2001). Pursuant to *McDonnell Douglas*, plaintiff has the initial burden to establish a prima facie case of discrimination. To establish a prima facie case, plaintiff must present sufficient admissible evidence to raise an inference that misconduct occurred, but need not prove actual discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant is successful, then the burden returns to the plaintiff to show by a preponderance of the evidence that the alleged legitimate, nondiscriminatory reason for the employment action is merely a pretext for discrimination. *Id.*; *See also Kotelnikov v. Portland Habilitation Center*, 545 F.Supp.2d 1137, 1139 (D. Or. 2008).

In order to establish the causal link of the prima facie case, Duke must show that his worker's compensation claim was a "substantial factor," or "a factor that made a difference," in FMK's decision to terminate him. *Lewis v. Wal-Mart Stores*, Inc., 2009 WL 3462056 at *9 (D. Or.). Proof needed to defeat summary judgment at the prima facie level is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.*

*Duke v. F.M.K. Const. Servs., Inc.*, --- F. Supp. 2d ----, 2010 WL 3607377, at *3 (D. Or. Sept. 9, 2010).

### a.    Causation and Timing

Before launching into the first of several detailed analyses of causation, I pause to address Ballard's general argument that the temporal relationship between her workers' compensation claims and her various adverse employment actions creates an inference of causation.  Proximity between a protected action and a retaliatory employment decision can certainly provide evidence of causation. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2000) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.

2003) (depending on the circumstances, "three to eight months is easily within a time range that can support an inference of retaliation."). Here, however, clear inferences based on timing seem to be more difficult to draw. Ballard filed three workers' compensation claims and each claim went through several levels of appeal. Thus, Ballard was in a perpetual state of protected activity from March 2005 until well after her termination. It was during this three year period that Ballard also was allegedly subject to a variety of adverse employment actions. Since these allegedly discriminatory actions also coincide temporally with everything else that occurred in Ballard's complex employment history, the timing of Ballard's workers' compensation activity on its own does not provide significant probative evidence of causation. Nevertheless, interpreting evidence in favor of Ballard, I find that where other evidence raises an inference of causation, timing bolsters that inference.

### b. Applications for Internal Positions

As discussed above, rejection of Ballard's Bus Supervisor and Fare Inspector applications application are the only timely allegations relating to Ballard's applications for non-driving positions. However, since the Fare Inspector position was never filled by TriMet, only the disqualification of Ballard's Bus Supervisor application constitutes an actionable adverse employment decision.

### (1) Prima Facie Case

TriMet challenges the causation element of Ballard's prima facie case. TriMet contends that even if the court assumed Free harbored discriminatory animus towards Ballard based on her filing of workers' compensation claims, Ballard has not produced admissible evidence showing that the allegedly adverse employment actions she suffered would not have occurred but for

Page 30- OPINION AND ORDER

Free's conduct.  Indeed, TriMet acknowledges that the Ninth Circuit has adopted a "but for" test

for the causation element in cases where the individual with discriminatory animus does not

make the allegedly adverse employment decision. *Poland v. Chertoff*, 494 F.3d 1174, 1181 (9th

Cir. 2007).  That test requires the court to determine whether the biased party initiated an inquiry,

investigation, or disciplinary proceeding that set in motion a process leading to an adverse

employment decision, even if that decision was based on nondiscriminatory grounds and made

by an individual lacking discriminatory bias.  *Id.*  In such circumstances, the discriminatory

animus of the biased individual is imputed to the employer only if the plaintiff can prove that the

biased individual "influenced, affected, or was involved in the adverse employment decision."

*Id.* at 1183.

        Here, I find that Ballard presents enough evidence to raise the inference that Free's

discriminatory animus based on her invocation of workers' compensation rights was a "but for"

cause of the rejection of her Bus Supervisor application and that Free's bias should be imputed to

TriMet because he influenced the rejection of Ballard's application.  The record reflects that John

Free exhibited hostility towards Ballard regarding her filing of workers' compensation claims

and requests for light duty several times between February 2006 and November 2007.  Moreover,

TriMet's director of transportation operations Peggy Hanson observed "Free's tone and

demeanor when he spoke of Ms. Ballard" and "could not understand his animosity and

frustration toward Ms. Ballard and sensed that for Mr. Free the matter was unreasonably

personal."  (Amend. Hanson Decl., #64, ¶11.)  The nature and tone of Free's comments arguably

suggest that he thought Ballard was attempting to game the workers' compensation system and

wanted to ensure that, at the very least, she would not return to driving buses for TriMet.

There is also ample evidence that Free influenced the characterization of Ballard's absences as time loss.  Initially, Free was involved in providing absence records for Ballard's work record review in July and October 2007 (Lloyd Decl., #87, Ex. 1.)  Additionally, Lucy Shipley, director of the TriMet department that manages employee records, benefits, and compensation, consulted extensively with Free about how to code Ballard's absences and how the workers' compensation appeals process affected those characterizations of absences.  (Snyder Decl., #66, Ex. 96, 24:21-25:10); (Snyder Decl., #109, Ex. 115, 25:4-5, 25:34-26:6, 63:25-64:3) (Shipley Deposition).  Free told Shipley that absences associated with a denied workers' compensation claim would be initially recorded as time loss, but later revised after the claim was ultimately accepted through a collaboration between Free and the payroll office.  (Snyder Decl., #66, Ex. 96, 24:21-25:12.)  Further, Shipley testified that certain coding decisions were entirely dictated by Free.  (Snyder Decl., #109, Ex. 115, 78:15-21.)  Indeed, Shipley asked Free to work with payroll to fix some incorrectly coded time on Ballard's absence history.  (Snyder Decl., #66, Ex. 115, 64:19 - 65:7.)  Finally, Free consulted with Jean Brown, the human resources representative who actually evaluated Ballard's work record for various positions, about the nature of Ballard's workers' compensation appeals.  (Snyder Decl., #66, Ex. 4, at 55:16 - 56:12) (Free Deposition).

In sum, Free appeared angry with Ballard over her workers' compensation requests and assisted TriMet staff to classify Ballard's absences and evaluate her time loss.  This evidence suggests that Free influenced the characterization of some of Ballard's injury-related absences as time loss, leading to her ultimate disqualification from the Bus Supervisor position.  Although this is not conclusive proof of causation, it easily satisfies the liberal standard for establishing a

prima facie case.

### (2)    Legitimate Non-Discriminatory Reason

TriMet contends it rejected Ballard's Bus Supervisor application because her excessive

time loss disqualified her from that position.  TriMet acknowledges that Or. Rev. Stat.

659A.046(1) requires reemployment in an "available and suitable" position for an employee who

sustained a compensable injury and is disabled from their regular duties.  However, TriMet

argues, regulations define "suitable" employment to mean, in part, a position for which the

injured worker meets "minimum standards used by the employer to fill the position."  O.A.R.

839-006-0145(2);  O.A.R. 839-006-0145(3)(a).  Ballard's applications were evaluated using the

work record review process, as explained in TriMet's human resources policies.  Indeed,

Ballard's Bus Station application was disqualified because TriMet human resources

representative Jean Brown determined that her time loss exceeded 110 hours, the maximum

allowed under those policies. (Brown Aff., #55.)  Brown also reviewed that calculation to verify

its accuracy in late October 2007 and determined that, although the initial count of time loss

hours was inaccurate, Ballard still had 183.9 hours of time loss.  Thus, TriMet presents a

legitimate justification for its conduct.

### (3)    Pretext

Nevertheless, Ballard offers persuasive reasons why a jury could find TriMet's

justification to be mere pretext for discrimination.  First, while the decision to disqualify Ballard

from the Bus Supervisor position could have resulted from a neutral application of TriMet's

policy, it is also possible that John Free intentionally influenced the outcome of Ballard's work

record review to ensure that she did not qualify for the position, as I explained in addressing

causation.  Second, factual questions remain even now concerning the correct calculation of

Ballard's time loss.  In briefing and oral argument, TriMet's proposes an updated calculation

which purportedly demonstrates that Ballard's time loss unrelated to her workplace injuries

would still have disqualified her from the Bus Supervisor position, among others.  I am not

convinced that this new calculation singlehandedly warrants summary judgment.  The TriMet

policy for applying "push-back" periods is complex and TriMet does not transparently explain

the steps it uses to arrive at that new calculation.  Even more fundamentally, TriMet's new

calculation is more akin to a trial defense to defeat Ballard's claim for damages than an

irrefutable proof that TriMet acted without bias in disqualifying Ballard from the position.

Consequently, Ballard's allegation that TriMet discriminated in disqualifying her from the Bus

Supervisor position survives summary judgment.

### c.    Work Releases, Physical Examinations, and Failure to Reinstate

Since all of these alleged actions are related, I discuss them together.  As described above,

only Ballard's allegations concerning releases, examinations, and actions occurring after October

18, 2008 are cognizable bases for her workers' compensation discrimination claim.  TriMet does

not seem to dispute that Ballard was adversely affected by these actions.  Therefore, the main

issues are whether Ballard provided enough evidence to establish her prima facie case, especially

the causation element, and whether Ballard creates a factual dispute concerning pretext.

### (1)    Prima Facie Case

There is sufficient evidence in the record to establish a causal link between John Free and

the other TriMet employees who prevented Ballard from returning to work in the last month of

Page 34- OPINION AND ORDER

her employment.  Several months before Ballard was placed on work hardening procedures, Mickey Young requested help from Colleen Sexton and John Free in responding to Ballard's multiple letters requesting light duty or modified duty work.  (Lloyd Decl., #87, Ex. 51) (email chain); (Snyder Decl., #66, Ex. 99) (continuation of email chain proposing meeting with Free to discuss "next steps").   Although depositions from Young and Hayden Talbot reveal that neither remembers who advised them about TriMet's policies concerning medical examinations, safety, work hardening, and workers' compensation, it is reasonable to infer that Free influenced their decision-making in Ballard's case.

### (2)    Legitimate Nondiscriminatory Reason

TriMet provides neutral justifications for its conduct regarding these allegations.  TriMet argues that it required Ballard to undergo an October 27, 2008 medical examination with Dr. Harris to determine whether Ballard could safely drive a bus, given that her physician, Dr. Albright, had changed his medical opinion from the previous month by certifying that Ballard could resume full-time driving.  Alternatively, TriMet contends that Ballard's statutory right to reinstatement had lapsed either in October 2007 or in March 2008, preventing Ballard from obtaining reinstatement to her position as a bus operator.[21]

---

[21] TriMet notes that although Or. Rev. Stat. § 659A.043(1) provides for reinstatement to the worker's former position upon such a demand (as long as the position exists and the worker is not disabled from doing it), Or. Rev. Stat. § 659A.043(3)(a)(A) terminates the right to reinstatement when an attending physician or medical arbiter determines the worker cannot return to her former position.  TriMet asserts that Dr. Gerry determined Ballard could not return to driving, first in October 2007 (Snyder Decl., #66, Ex. 44) and again in March 2008 (Toran Aff., #54, Ex. 56) (concurring with report of Dr. Woodward, who, in turn concurred with a report by Dr. Craven, which itself was based on Ballard's physical capacity evaluation by a physical therapist on October 26, 2007).  Thus, TriMet contends that these reports extinguished Ballard's right to reinstatement.

### (3)      Pretext

Ballard presents sufficient evidence to create a factual dispute concerning whether

TriMet's justifications are mere pretext for discrimination.   First, TriMet's decision to require

verification of Ballard's release to full-time driving potentially ran afoul of Oregon's rules about

reinstatement.  A physician's release is prima facie evidence of the employee's ability to return to

duties.  Or. Rev. Stat. § 659A. 043(1).  Moreover, an employer may not challenge the treating

physician's release "as a subterfuge to avoid employer responsibilities under ORS 659A.043,"

the reinstatement statute.  O.A.R. 839-006-0130(4)(a).  One plausible interpretation of the

evidence before the court is that TriMet improperly questioned Dr. Albright's release in order to

delay Ballard's return to driving.  Indeed, Peggy Hanson, TriMet's director of transportation

operations who was responsible for oversight of all terminations in the rail and bus transportation

divisions, declared that Ballard's October 22, 2008 medical release from Dr. Albright "was

proper and met the required conditions to return Ms. Ballard to work." (Amend. Hanson Decl.,

#64, ¶8.)  Finally, TriMet's failure to complete the third doctor opinion process, which it pledged

to do on November 3, 2008, provides some evidence that TriMet's safety-related justifications

for sidelining Ballard were pretext.  If TriMet actually wanted to determine whether Ballard was

fit to drive, it could have scheduled a third doctor examination and delayed Ballard's upcoming

termination until it had received the results from that examination.  Overall, there remains a

factual dispute concerning whether TriMet used the requirement of a new medical examination to

delay Ballard's return to work long enough for her to be terminated under the WWA's continuity

of service provision.

### d.      Termination

Page 36- OPINION AND ORDER

As Ballard affirmed at oral argument, her termination allegation is the crux of her workers' compensation discrimination claim. Again, causation and pretext are the main issues raised by the parties pertaining to this allegation.

### (1)    Prima Facie Case

Regarding Ballard's prima facie case, and especially the causation element, there is little evidence in the record directly connecting John Free with TriMet's decision to place Ballard on medical termination status. Nevertheless, a reasonable juror could decide that John Free's conduct set in motion a process leading to Ballard's termination by closing off other avenues for Ballard to engage in full-time work. Viewing the evidence in the light most favorable to Ballard, Free arguably interpreted the TriMet's light duty work policy in a manner limiting Ballard's opportunities to work light duty and thereby avoid time loss, prevented Ballard from securing a non-driving position by mischaracterizing her workers' compensation absences as time loss, and motivated Ballard's supervisors to preclude her from returning to driving by instituting work hardening procedures and requiring her to be cleared by various doctors. This, in brief, is the essence of Ballard's "domino" theory. Ninth Circuit jurisprudence confirms that such a chain of events suffices for proof of causation. *See Poland*, 494 F.3d at 1181 (causation shown when the biased party initiates a process leading to an adverse employment decision, even if the ultimate decision is based on nondiscriminatory grounds and made by an individual lacking discriminatory bias).

### (2)    Legitimate Non-discriminatory Reason

TriMet states that it legitimately terminated Ballard under the continuity of service provision of the WWA. That agreement provides that continuity of service is broken and

Page 37- OPINION AND ORDER

seniority terminates when "absence due to sickness" exceeds twelve months, unless extended by

TriMet and the union. (Toran Aff., #54, Ex. 1, at 4.)  TriMet must provide thirty days of written

notice of broken continuity of service and termination of seniority to the employee.  *Id.*  An

employee returns to work, thereby breaking the period of absence, only when she completes 30

calendar days in her "regular work assignment" and light duty work does not count as time

worked in an employee's regular work assignment.  *Id.*  Since Ballard failed to return to full-time

driving before November 17, 2008, her continuity of service lapsed.

### (3)    Pretext

Ballard initially contends that TriMet's justification is pretext because the WWA's

continuity of service provision does not apply to her at all for various reasons.  I do not find any

of these arguments persuasive.  First, Ballard asserts that she could not be terminated under the

WWA because doing so would prevent her from seeking reemployment as guaranteed by state

law.  The WWA, however, explicitly provides for employees to exercise their statutory right of

reemployment even after termination.  (Toran Aff., #54, Ex. 1 at 4.)  Second, Ballard argues that

the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), does not permit the WWA

to preempt Ballard's statutory right to reemployment.  Again, the terms of the WWA do not

preempt the right of reemployment.  Moreover, even if they did, TriMet is a public employer that

is exempt from the LMRA.  *See* 29 U.S.C. § 152(2) (("The term 'employer' . . . shall not include

... any State or political subdivision thereof ....") ; *Ford v. D.C. 37 Union Local 1549*, 579 F.3d

187, 188 (2d Cir. 2009); *see also Moir v. Greater Cleveland Regional Transit Authority*, 895

F.2d 266, 270-72 (6th Cir. 1990) (applying exemption to regional transit district and collecting

cases).  Finally, Ballard contends that the WWA continuity of service provision applies only to

employee injuries sustained outside of the workplace. TriMet's past practice, however, involved applying continuity of service rules to both non-work-related injuries and work-related injuries such as the ones suffered by Ballard. (Snyder Decl., #66, Ex. 93 at 54:4-19) (Talbot deposition).

Even though these arguments fail, there is enough evidence in the record to call into question the legitimacy of TriMet's justification for Ballard's termination. There are serious factual questions about John Free's conduct and the degree of his influence in the course of Ballard's employment history at TriMet, which I analyzed above and will not repeat here. Additionally, the presence of a dissenting voice within TriMet's management raising objections to TriMet's handling of Ballard's case undermines TriMet's explanation. Peggy Hanson, who was responsible for supervising Ballard's termination to ensure that TriMet complied with its legal obligations, states that she advocated for Ballard's return to work several times with various high-level TriMet staff, including John Free and human resources managers. (Amend. Hanson Decl., #64, ¶¶4,9.) She also told Stephen Banta, TriMet's director of operations, that she believed Ballard's termination was "in error" and that TriMet "made a serious mistake," and urged Banta to restore Ballard's employment. *Id.* at ¶13. Hanson's declaration also implies– but does not state explicitly– that she warned her employees to follow TriMet protocol in handling Ballard's case, not Free's instructions, and ordered Free to communicate directly with her about Ballard's case. *Id.* at ¶10. Thus, Hanson's statements suggest that Ballard's termination, although ostensibly justified by a break in continuity of service, could have been motivated by Free's personal concerns. Consequently, the termination allegation should be heard by a jury.

### 3.    Race Discrimination

Ballard brings race discrimination claims under Title VII, Or. Rev. Stat. §

659A.030(1)(b), and Section 1981.  Ballard's Title VII and state law discrimination claims allege

that TriMet engaged in a pattern of discrimination against non-white employees who file

workers' compensation claims.  Ballard's Title VII claim additionally alleges that TriMet

disciplined and terminated Ballard because of her race.  Ballard's Section 1981 claim, against

both TriMet and Free, similarly asserts that both defendants disciplined and terminated Ballard

because of her race, but also alleges that Ballard's race motivated defendants to initially deny

Ballard's workers' compensation claims.[22]

### a.      Standards

I agree with TriMet that Ballard's Section 1981 claim against TriMet must prove that

TriMet had a "policy or custom" of discrimination, even though she did not allege as much in her

complaint.  *See Fed'n of African Am. Contrs. v. City of Oakland*, 96 F.3d 1204, 1214-15 (9th Cir.

1996) (holding that there is no respondeat superior liability for state actors sued under §1981, and

therefore, that §1981 plaintiffs must still prove a "policy or custom" of discrimination as required

by *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978)).  Consequently,

considering that Ballard presents no evidence of a generally established policy or custom of racial

discrimination at TriMet, summary judgment is granted on Ballard's Section 1981 claim against

TriMet.

Concerning Ballard's Section 1981 claim against Free, courts in this circuit have held that

a plaintiff may bring a Section 1981 claim against a state actor in his individual capacity "if the

individual was personally involved in the discrimination and intentionally caused the

---

[22] Ballard apparently abandons this allegation, since she failed to address it in oral
argument and presented no evidence to substantiate it in her summary judgment briefing.

Page 40- OPINION AND ORDER

infringement of rights protected by § 1981." *Binum v. Warner*, No.06-935-AA, 2007 WL 54778, at *1 (D. Or. Jan. 4, 2007) (Aiken, J.); *see also Bell v. Clackamas County*, 341 F.3d 858, 866-67 & n. 3 (9th Cir. 2003) (requiring showing of improper motive or conduct for individual liability). Therefore, Ballard's claim against Free does not depend on establishing a policy or custom of discrimination.  Instead, the claim may only survive summary judgment if Ballard produces evidence creating a factual dispute about whether Free was personally involved in intentional race discrimination against Ballard.  Although Ballard produces sufficient evidence to advance to a jury on several race discrimination allegations against TriMet (which I analyze in more detail below), Ballard fails to produce any evidence showing that Free *participated personally* in any of those allegedly racially discriminatory acts.  Moreover, although Free likely participated in denying Ballard's workers' compensation claims, Ballard produces absolutely no evidence that Ballard's race motivated those denials.  In fact, the evidence discussed at length relating to Ballard's workers' compensation discrimination claims strongly suggests that any discriminatory animus harbored by Free was linked to Ballard's invocation of workers' compensation rights. Consequently, Free is entitled to summary judgment on Ballard's Section 1981 claim against him.

Concerning Ballard's Title VII and Oregon law race discrimination claims, I disagree with TriMet's suggestion that Ballard must present proof of a "pattern or practice" of discrimination, as opposed to mere proof of discriminatory acts.[23]   Ballard's Title VII claim

---

[23] I address these claims together because Oregon race discrimination claims require proof to the same standard as Title VII claims.  *See Ahmed v. Mid-Columbia Medical Center*, 673 F. Supp. 2d 1194, 1206-07 (D. Or. 2009) ("plaintiff must meet the same standards to prove a claim under § 659A.030(1)(b) that he must meet to establish a claim under Title VII").

Page 41- OPINION AND ORDER

posits a standard disparate treatment theory in addition to the "pattern or practice" theory; it lists

five discrete disciplinary actions that Ballard contends were motivated by race.  Even had

Ballard's complaint had not embraced a conventional disparate treatment theory, Ballard could

still have pursued that theory so long as TriMet suffered no prejudice.  *See Fontana v. Haskin*,

262 F.3d 871, 877 (9th Cir. 2001) (because of liberal federal notice pleading standards, specific

legal theory need not be pleaded as long as factual allegations show plaintiff entitled to relief);

*Green Country Food Mkt., Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir. 2004)

("plaintiff should not be prevented from pursuing a claim simply because of a failure to set forth

in the complaint a theory on which the plaintiff could recover, provided that a late shift in the

thrust of the case will not prejudice the other party in maintaining its defense.")   Here, as

evidenced by summary judgment briefing and discussion at oral argument, TriMet was well

aware that Ballard's race discrimination theory focused on specific discriminatory acts, not on an

overarching policy of racial discrimination at TriMet.  Thus, I do not hold Ballard to the

heightened proof standard for suits alleging a pattern or practice of discrimination.  *See Obrey v.

Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (requiring proof of discrimination as employer's

standard operating procedure).

       The same principles also permit Ballard to proceed on her Title VII and Oregon law race

discrimination claims under different allegations than she originally identified in her complaint.

Ballard listed five allegedly discriminatory acts in the complaint: (1) "denying her light and/or

modified duty work;" (2) "placing her on Attendance Goals;" (3) "denying her applications for

other positions with TriMet for which she was otherwise qualified;" (4) "rejecting the work

releases provided by her treating physicians and requiring her to undergo a complete physical

with TriMet's consulting physician, Dr. Harris;" and (5) "by terminating her seniority and

employment with TriMet and deeming her ineligible for rehire." (Compl., #1, ¶121.)

Ballard's presentation of comparator evidence at summary judgment addresses some of these

issues, including TriMet's denial of Ballard's application for Bus Supervisor due to time loss

associated with denied workers' compensation claim that was pending on appeal, and TriMet's

refusal to reinstate Ballard following her October 22, 2008 medical release.  Additionally,

though, Ballard presents comparator evidence raising allegedly discriminatory acts that were not

described in her complaint.  These include TriMet's failure to provide Ballard with vocational

rehabilitation services and TriMet's handling of Ballard's post-termination grievance.  There is,

however,  no indication that Ballard's shift in focus has prejudiced TriMet, since TriMet ably

responds to Ballard's comparator evidence.

     Now I turn to the merits of Ballard's Title VII and Oregon law race discrimination claims.

The *McDonnell Douglas* proof structure for such discrimination claims is familiar.  Plaintiff

must first establish a prima facie case of employment discrimination through any evidence that

creates an inference of unlawful discrimination, including evidence of "similarly situated

individuals" who are outside of the plaintiff's protected class, yet who are treated more favorably

than the plaintiff.[24]  *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1155–56 (9th Cir. 2010).

Next, the burden of production, but not persuasion, shifts to the employer to provide a legitimate,

nondiscriminatory reason for allegedly adverse employment action.  *Id.*  If the employer

succeeds, the plaintiff must then raise a triable issue of material fact concerning whether the

---

    [24] For simplicity, I refer to these potentially similarly situated individuals as
"comparators."

defendant's justification was merely pretext for unlawful discrimination.  *Id.*  Again, the plaintiff

may use evidence of similarly situated individuals to demonstrate a triable issue on the question

of pretext.  *Id.* at 1158.  In those cases, courts typically analyze whether an individual is similarly

situated at the pretext stage.  *Id.* at 1159.

### b.    Comparators

Here, Ballard's sole evidence of race discrimination lies in her presentation of several

non-African-American TriMet bus operators with workers' compensation claims who were

purportedly treated more favorably than Ballard in several manners.  Without adhering too

slavishly to the structure of the *McDonnell Douglas* proof system, I analyze Ballard's comparator

evidence to determine whether it creates a factual dispute about the ultimate issue at the heart of

these claims: whether TriMet treated Ballard less favorably than others because of her race.  *See*

*Hawn*, 615 F.3d at 1159 ("Although we seek to conduct our inquiry at the proper *McDonnell*

*Douglas* step . . . we keep sight of the ultimate issue in this case: whether the employer is treating

some people less favorably than others because of their race, color, religion, sex, or national

origin" ) (internal quotations and citations omitted).  For each of the five comparators, I attempt

to examine both whether the comparator was similarly situated to Ballard and whether the

comparator was treated more favorably than Ballard, although these inquiries sometimes become

indistinguishable.  Ultimately, this analysis of comparators narrows the scope of Ballard's race

discrimination claims significantly.

### (1)    LaNita Hansen and Internal Position Applications

Ballard contends that examining the employment history of LaNita Hansen demonstrates

that Ballard was treated less favorably than Caucasian TriMet employees in her applications for

Page 44- OPINION AND ORDER

other internal TriMet positions.  Hansen, like Ballard, applied for a Bus Supervisor position in

October 2007.  Both were initially disqualified due to excessive time loss stemming from

workers' compensation absences.  Nevertheless, almost two weeks after Hansen was originally

disqualified, Greg Larson, a TriMet human resources employee, noted that Hansen's "time loss is

almost entirely attributable to denied Workers [sic] Compensation" and suggested to human

resources manager Jean Brown that Hansen should still be considered for the position since "it is

a common practice in cases such as Lanita's that we hold those hours in abeyance pending the

outcome of the appeal."  (Lloyd Decl., #87, Ex. 11.)

     Brown apparently did not take up Larson's suggestion.  A December 2007 email

exchange between Station Manager Hayden Talbot and Brown attempted to clarify TriMet's

standard protocol regarding work record reviews for individuals with pending workers'

compensation appeals.  (Toran 2nd Supp. Aff., #104, Ex. 108.)   Talbot initially wrote, in part:

> I was approached by [Hansen] concerning her disqualification for Road Supervisor due to
> excessive time loss . . . related to a denied WC claim which she is appealing.  Under such
> circumstances, is this our standard protocol, *to exclude at the time of application* if a
> claim is in dispute?  That does not seem unreasonable to me, since if we allowed the
> individual to proceed and they were successful in obtaining the promotion, the later
> outcome of a claim might mean we had hired an employee who was not qualified.

*Id.* (emphasis added).  Brown responded, in part:

> Your interpretation of the Work Record Review Criteria is correct.  It is and has been our
> past practice to exclude at the time of application if a claim is in dispute.

*Id.*  Ballard contends that Brown actually endorses Greg Larson's interpretation– that time loss

attributable to workers' compensation claims on appeal should not be counted in a work record

review– and thus at least raises questions of fact concerning whether Hansen remained

disqualified for the position.

Page 45- OPINION AND ORDER

My reading of the exchange, even in the light most favorable to Ballard, suggests that

Brown endorsed the opposite interpretation.  Talbot's comment only makes sense if the phrase

"exclude at the time of application" refers to exclusion of the applicant from consideration, not

exclusion of the workers' compensation-related time loss.  Talbot's hypothetical underscores this

point.  If TriMet allowed the applicant to proceed despite having excess time loss and the

applicant's workers' compensation appeal failed after being hired, TriMet would have

inadvertently hired an applicant unqualified for the position due to her excessive time loss.  To

avoid such an outcome, Brown confirmed Talbot's interpretation that such an applicant should be

excluded from consideration.

Consequently, although Hansen was situated similarly to Ballard, there is no genuine

factual dispute that she received the same treatment as Ballard with regard to her Bus Supervisor

application: both were excluded from consideration based on time loss related to a denied

workers' compensation claim pending appeal.  Since Ballard presents no other evidence raising

an inference of race discrimination in her applications for internal TriMet positions, summary

judgment is granted for TriMet on this aspect of Ballard's race discrimination claims.

### (2)    Tamara Glass and Return to Work Following Medical Release

Ballard also provides comparator evidence based on TriMet's treatment of Tamara Glass.

Glass was one of three bus operators, including Ballard, whom TriMet placed on medical

termination status on November 18, 2008.  (Lloyd Decl., #87, Ex. 26 at 1) (Glass); (Lloyd Decl.,

#87, Ex. 27 at 1) (Guymon); (Snyder Decl., #66, Ex. 85) (Ballard).  On January 12, 2009, almost

two months after being terminated, Glass submitted a medical release to TriMet allowing her to

resume driving with "minimum overhead activities." (Lloyd Decl., #87, Ex. 26 at 2.)

Consequently, TriMet assistant station manager Mickey Young reinstated Glass to her bus

operator position with payment of back wages and a readjustment of seniority. *Id.* In addition,

TriMet required Glass to pass drug and alcohol screening and a DMV record review and

complete refresher training. *Id.* Young also notified Glass she would be subject to the WWA's

continuity of service provisions. *Id.* TriMet argues that Glass is not similarly situated because,

unlike Ballard, Glass' previous doctors' opinions did not contradict her later release to work.

      In viewing the evidence in the light most favorable to Ballard, as I must on summary

judgment, I find that a jury question remains concerning both the similarity between Glass' and

Ballard's situations and the evenhandedness of TriMet's responses. Both Glass and TriMet

submitted medical releases proclaiming them fit to return to regular duty. TriMet accepted

Glass' release at face value and returned her to work soon thereafter, yet challenged Ballard's

release as inconsistent with her prior doctors' opinions and prevented her from resuming full-

time driving. While it is possible that a dissimilarity in Glass' and Ballard's medical histories

alone accounted for TriMet's different treatment of their two medical releases, it is also plausible

that race played a role in TriMet's decision. In sum, a jury must ultimately decide whether Glass

and Ballard were similarly situated and whether TriMet's reinstatement of Glass provides

evidence that TriMet's justifications for refusing to allow Ballard to return were pretextual.

          (3)     **Cynthia Guymon and Failure to Provide Vocational
Rehabilitation**

      Cynthia Guymon, a Caucasian TriMet employee, was the other bus operator terminated

under the continuity of service provision of the WWA on November 18, 2008. (Lloyd Decl., #87,

Page 47- OPINION AND ORDER

Ex. 27.)  The next month, TriMet apparently began supplying Guymon with vocational

rehabilitation services through a third party provider.  (Guymon Decl., #91, ¶6.)  Ballard argues

that TriMet's failure to offer her vocational rehabilitation services as it did for Guymon provides

evidence of race discrimination. TriMet, however, contends that since Guymon's medical

situation differed from Ballard's, Guymon is not a similarly situated comparator.

      The record, however, creates factual issues concerning whether TriMet treated Guymon

more favorably than Ballard in the vocational rehabilitation application process.  TriMet

produces a declaration from TriStar, its third party administrator, stating that Ballard was initially

determined ineligible for vocational rehabilitation services on May 2, 2008 because she suffered

no permanent impairment as a result of her accepted condition.  (Dean Decl., #106, ¶3a.)  In

briefing, TriMet justifies rejecting Ballard's vocational rehabilitation claim because a medical

arbiter determined that Ballard's inability to return to work was due to "wear and tear," not

Ballard's "accepted condition" of cervical strain and left shoulder strain.[25]  (D.'s Br., #92, at 27)

(citing Snyder Decl., #66, Ex. 65 at 4.)  Yet, the medical arbiter's report that TriMet relies upon

to demonstrate Ballard's ineligibility was not issued until July 10, 2008, more than *two months*

*after* Ballard was deemed ineligible.  (Snyder Decl., #66, Ex. 65 at 1.)  Thus, construing the

record in favor of Ballard, it appears that TriMet found Ballard ineligible for vocational

rehabilitation without proper medical justification.

---

[25] Although I do not attempt to thoroughly analyze Oregon's vocational rehabilitation
eligibility requirements, it appears at first glance that such a medical finding would disqualify
Ballard.  *See* O.A.R. 436-120-0320(11)(c) (one of requirements for vocational assistance
eligibility is that the worker's inability to return to regular employment is caused by her workers'
compensation injury or aggravation).

Page 48- OPINION AND ORDER

Contrast this with TriMet's handling of Guymon's vocational rehabilitation claim. Guymon's own declaration indicated that she was first offered vocational rehabilitation services in December 2008, the month after she was terminated. Further, the TriStar declaration states that Guymon was determined eligible for vocational rehabilitation on the basis of a physician examination on November 9, 2009 finding that her accepted condition prevented her from returning to work. (Dean Decl., #106, ¶4 and Ex. 2 at 1.) Thus, Guymon apparently began receiving rehabilitation services *eleven months before* medical documentation demonstrated her eligibility.

The limited record before me suggests a disparity in TriMet's vocational rehabilitation eligibility determinations. While TriMet apparently issued both of these determinations without proper medical justifications, TriMet denied benefits to Ballard but granted them to Guymon. TriMet contends that Ballard cannot now relitigate her eligibility for vocational rehabilitation, since she voluntarily abandoned her appeal of the decision finding her ineligible. I do not attempt to conclusively determine whether Ballard was eligible for vocational rehabilitation. I merely observe that TriMet's conduct in handling Ballard's and Guymon's vocational rehabilitation cases provides some evidence from which to infer that TriMet's denial of Ballard's vocational rehabilitation benefits was based on racial discrimination rather than a straightforward application of eligibility requirements. Consequently, Ballard's race discrimination claim may advance to a jury on the basis of this allegation.

### (4)    Deborah Shill and Post-Termination Grievance Settlement

TriMet also placed Deborah Shill, a Caucasian employee, on medical termination status

Page 49- OPINION AND ORDER

on September 12, 2002 because of a break in her continuity of service.  (Lloyd Decl., #87, Ex. 29 at 1.)  Ballard provides the details of an agreement between Shill and TriMet resolving a grievance Shill filed following her termination, contending that Ballard received less favorable treatment than Shill.  *Id.* at 2.  In response, TriMet presents the terms of a settlement offer that it extended to Ballard to resolve her grievance, but which Ballard rejected.  (Toran 2nd Supp. Aff., #104, Exs. 101,102.) TriMet argues that it's offer to Ballard demonstrates that it treated her similarly to Shill.  Both Shill's settlement agreement and Ballard's rejected settlement offer are admissible for the purposes of summary judgment, as I describe below in addressing Ballard's motion to strike.  The offers differ somewhat in their terms, thus creating a factual question for the jury concerning whether TriMet indeed treated Shill more favorably than Ballard in settlement of post-termination grievances.  Further, TriMet's other attempts to distinguish Shill as a comparator do not conclusively prove that Shill is not similarly situated; rather, they simply create factual disputes about the degree of similarity that must be resolved by a jury.[26]  *See Hawn*, 615 F.3d at 1157 (whether two employees are similarly situated is ordinarily a question of fact).

### (5)    Robin Shamrell, Eligibility for Rehire, and Grievance Adjudication

Additionally, Ballard presents evidence that TriMet terminated Robin Shamrell, a Caucasian woman, on November 10, 2006 because her workers' compensation absences caused a break in her continuity of service.  (Lloyd Decl., #87, Ex. 28 at 1.)  In this respect, Shamrell and

---

[26] TriMet first argues that evidence about its treatment of Shill is irrelevant and "stale" since it dates back to 2002.  Second, TriMet contends that Shill is not similarly situated because Shill's grievance, unlike Ballard's, asserted that Shill's part-time work should be counted towards her continuity of service.  (Toran 2nd Supp. Aff., #104, Exs. 98,99.)

Ballard are similarly situated.  Ballard identifies two potential areas where TriMet treated

Shamrell more favorably, only one of which is a proper basis for comparison.   First, while

Shamrell's personnel order issued the same day as her termination letter indicated that she *was*

*eligible* for rehire, Ballard's personnel order stated that she *was not eligible* for rehire. (Snyder

Suppl. Decl., #112, Ex. 1); (Snyder Decl., #66, Ex. 86.)  The different characterizations of

eligibility for rehire at least creates a factual dispute over whether TriMet treated Shamrell more

favorably than Ballard.

The second area of putative preferential treatment concerns what both parties refer to as

the "resolution" of Shamrell's post-termination grievance.  Shamrell apparently filed a grievance

with TriMet and on March 14, 2007, a "Step 3" grievance committee upheld Shamrell's

grievance and provided the following remedy:

> (1) Reinstate operator Shamrell's employment
> (2) The absences associated with the [workers' compensation] injury will not be counted
> as a break in continuity of service.
> (3) When and/if operator Shamrell returns to work, the continuity of service provision
> will resume
> (4) Per WWA, Article 1, Paragraph 6c, operator Shamrell will be required to check in
> with her manager every two weeks.

(Lloyd Decl., #87, Ex. 28 at 2.)  Thus, unlike Deborah Shill, who settled her grievance with

TriMet, Shamrell advanced to an adjudication of the grievance.  While Ballard apparently also

filed a grievance following her termination, the parties suggest that the grievance has been stayed

prior to adjudication.  This distinguishing feature prevents the court from making any

comparison between TriMet's treatment of Shamrell and of Ballard in their respective grievance

adjudications.  In sum, while the difference between Shamrell and Ballard's personnel orders

provides some evidence supporting Ballard's prima facie case and her assertion of pretext, a

comparison of the handling of their grievances does not. Thus, Ballard may advance to a jury on

a race discrimination allegation concerning TriMet's failure to deem her eligible for rehire, but

not on an allegation concerning TriMet's conduct in grievance adjudication.

### c.    Summary

Ballard offers only comparator evidence to support her race discrimination claims. That

evidence raises an inference of race discrimination and a question of fact concerning pretext on

the following aspects of TriMet's conduct: (1) TriMet's denial of Ballard's vocational

rehabilitation claim on May 2, 2008; (2) TriMet's failure to allow Ballard to return to regular

driving duties following Dr. Albright's October 22, 2008 release; (3) TriMet's offer to settle

Ballard's grievance arising from her termination; and (4) TriMet's November 18, 2008 personnel

order deeming Ballard ineligible for rehire. At trial, Ballard must prove that TriMet's race-

neutral justifications are indeed pretext for discrimination and must also demonstrate what, if

any, damages resulted from each instance of TriMet's conduct.[27] The court acknowledges that a

factfinder could potentially find that these outcomes resulted from TriMet's alleged workers'

compensation discrimination, not race discrimination. At this point, however, Ballard produces

sufficient evidence to advance these limited aspects of her Title VII and Oregon law race

discrimination claims to a jury.

### 4.    Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of severe emotional distress, a plaintiff must

---

[27] For example, it is easy to see how failure to permit Ballard to return to regular driving resulted in her termination under the continuity of service provision of the WWA, but it will be more challenging for Ballard to prove that she suffered damages due to TriMet's failure to extend a certain grievance settlement offer.

plead that: (1) the defendant intended to inflict severe emotional distress on the plaintiff; (2) the defendant's acts caused the plaintiff's severe emotional distress; and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. *Sheets v. Knight*, 779 P.2d 1000, 1010 (Or. 1989). "A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House v. Hicks*, 179 P.3d 730, 736 (Or. Ct. App. 2008); *see also Pakos v. Clark*, 453 P.2d 682, 691 (Or. 1969) ("It was for the trial court to determine, in the first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.")

Here, Ballard fails to establish facts creating a jury question on all three elements. Concerning the first element, intent, Ballard argues that such intent can be inferred from TriMet's outrageous conduct. As I explain below, TriMet's conduct falls well short of outrageous and therefore fails to support an inference of intent.

Regarding the second element, severe emotional distress, Ballard describes several effects of being terminated, none of which rise to the level of severity required for this tort. Ballard gets upset when she tries to talk or think about her experience, feels withdrawn, and suffers "a lot of sleepless nights." (Toran Aff., #54, Ex 47, at 13.) She experiences pain, headaches, stress, and "tightness," but takes no medication for her distress and could not recall discussing her pain with any of her doctors. *Id.* at 13-16. She even spoke with a counselor from TriMet's employee assistance program several times on the phone, but never sought in-person treatment. *Id.* at 13-15. This showing simply does not meet the level of duration and intensity required. *Checkley v.*

Page 53- OPINION AND ORDER

*Boyd*, 14 P.3d 81, 94 (Or. Ct. App. 2000) ("In examining the severity of a plaintiff's distress, we

consider its duration and intensity") (internal quotations omitted); *see Checkley*,14 P.3d at  94

(quoting Restatement (Second) of Torts § 46 comment j (1965)) ("The law intervenes only where

the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The

intensity and the duration of the distress are factors to be considered in determining its severity.")

 Finally, the allegations at issue here do not constitute extraordinary transgressions of the

bounds of socially tolerable conduct in the context of an employment relationship.  As the

Oregon Court of Appeals explained:

> In every case in which this court or the Supreme Court has allowed an IIED claim
> asserted in the context of an employment relationship to proceed to a jury, the employer
> engaged in conduct that was not only aggravating, insensitive, petty, irritating, perhaps
> unlawful, and mean-it also contained some further and more serious aspect.   In some
> cases, the employer engaged in, or credibly threatened to engage in, unwanted physical
> contact of a sexual or violent nature . . . in other cases repeatedly used derogatory racial,
> gender, or ethnic slurs, usually accompanied by some other aggravating circumstance . . .
> in yet other situations, the employer exposed the plaintiff to actual physical danger.

*Clemente v. Oregon*, 206 P.3d 249, 255 (Or. Ct. App. 2009).  None of these circumstances is

present in this case.  Accordingly, summary judgment is granted for TriMet on Ballard's

intentional infliction claim.

## II. Ballard's Motion for Partial Summary Judgment

 For each allegation within Ballard's workers' compensation claim that survives TriMet's

motion for summary judgment, significant factual questions exist.  When examining the same

evidence in the light most favorable to TriMet, as I must on Ballard's motion, Ballard cannot

provide sufficient evidence to eliminate all genuine issues of material fact.  Therefore, Ballard is

not entitled to summary judgment on her workers' compensation claim.

### III.    Motions to Strike

Both parties move to strike various aspects of the record.[28]  For the most part, I do not

rely on the evidence the parties seek to strike in reaching my conclusions and therefore deny all

of their motions to strike as moot, with the exception of the following.  I deny Ballard's motion

to strike the time loss calculations in Jean Brown's affidavit.  Ballard contends that these

calculations are inadmissible hearsay because they conflict with Ballard's absence history.  This

argument is unpersuasive; a statement is not inadmissible hearsay merely because it is

contradicted by other evidence in the record.  I also deny Ballard's motion to strike

communications regarding TriMet's grievance settlement offer.  Federal Rule of Evidence 408

prohibits the admission of offers of compromise "to prove liability for, invalidity of, or amount

of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent

statement or contradiction." Fed. R. Evid. 408(a).  Here, however, TriMet relies on the settlement

communications to rebut Ballard's contention that she was treated less favorably than other

similarly situated comparators for the purpose of her race discrimination claim, not to establish

TriMet's liability for the conduct giving rise to Ballard's grievance.

---

[28] Ballard moves to strike portions of TriMet's concise statement of material facts,
TriMet's references to deposition transcripts without line numbers, the affidavit of Jean Brown
(Brown Aff., #55), an excerpt of Dr. Gerry's deposition (Supp. Toran Aff., #93, Ex. 74), a Step 3
Grievance Committee Report from August 9, 2008 (Supp. Toran Aff., #93, Ex. 76), an
arbitrator's decision on Ballard's grievance from July 21, 2007 (Supp. Toran Aff., #93, Ex. 81),
letters pertaining to Ballard's ADA accommodation process (Supp. Toran Aff., #93, Exs., 82, 83,
84, 85, 86, 89), excerpts from a handbook on Oregon civil rights law (Supp. Toran Aff., #93, Ex.
93), the affidavit of Karen Vlastelica (Vlastelica Aff., #94), and communications describing a
settlement offer extended to Ballard for her post-termination grievance and her rejection of that
offer. (2nd Supp. Toran Aff., #104, Exs. 101, 102.)  TriMet moves to strike portions of
declarations from other TriMet drivers who say they believe Ballard was treated differently
because of her race. (Guymon Decl., #91, ¶8);(Guengerich Decl., #90, ¶9.)

IV.    **TriMet's Motion for Reconsideration**

A court order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Where a party seeks reconsideration of a non-final order, the court has "inherent jurisdiction to modify, alter or revoke it." *United States v. Martin*, 226 F.3d 1042, 1048-1049 (9th Cir. 2000). Generally, "[r]econsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

TriMet moves for reconsideration of a portion of this court's opinion and order (#36) determining that certain documents now reproduced as Exhibit 24 to the Declaration of Judy Snyder were not subject to the attorney client privilege.[29] In that opinion, I analyzed the privilege issue using federal privilege law, which generally requires that for a communication is not privileged unless it was made primarily for the purpose of obtaining legal advice or services from an attorney. *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981). TriMet now proposes that the court apply Oregon privilege law, since Federal Rule of Evidence 501 requires application of state, rather than federal, privilege law in civil proceedings "with respect to an

---

[29] Elsewhere in briefing, TriMet suggested that it would challenge the admissibility of this exhibit on the basis that it contained discussion of settlement. TriMet has not yet formalized that objection. Even if it had, the objection would be futile. While the email would be inadmissible under Federal Rule of Evidence 408(a) to establish TriMet's liability in a proceeding concerning Ballard's underlying workers' compensation claim, it is likely admissible here when offered to demonstrate John Free's hostility towards Ballard on her workers' compensation discrimination claim.

Page 56- OPINION AND ORDER

element of a claim or defense as to which State law supplies the rule of decision . . . ." Fed. R.

Evid. 501.  TriMet notes that the attorney client privilege under Oregon law is somewhat broader

than under federal law, protecting "confidential communications made for the purpose of

facilitating the rendition of professional legal services to the client,"  including communications

"[b]etween representatives of the client or between the client and a representative of the client."

Or. Ev. Code 503(2).  Clearly, the federal and Oregon privileges conflict.

This case, however, does not solely involve state law claims.  In addition, it involves

several claims for which this court has federal question jurisdiction (Title VII and Section 1981

claims).  Moreover, the document at issue relates to John Free's potential discriminatory animus

towards Ballard, an issue relevant to both state and federal law claims.  In cases involving federal

question jurisdiction with "pendent" state law claims, Ninth Circuit courts apply federal privilege

law.  *See Religious Technology Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992).

Moreover, when a conflict between privilege laws arises, courts favor the body of privilege law

that would admit the evidence at issue.  *See* Report No. 93-1277, Comm. on the Judiciary, United

States Senate, 93d Cong., 2d Sess., p.12, n.17 (1974) (when conflicting bodies of privilege law

apply to same piece of evidence, "the rules favoring reception of the evidence should be

applied").  Consequently, this court appropriately relied upon federal privilege law in its earlier

opinion and order.  TriMet's motion for reconsideration is therefore denied.

//

//

//

//

Page 57- OPINION AND ORDER

## CONCLUSION

For the foregoing reasons, TriMet and John Free's motion (#51) for summary judgment is granted in part and denied in part, as follows:

Workers' Compensation Discrimination Claim

> TriMet and Free's motion for summary judgment is granted regarding any conduct occurring before October 3, 2007 or between March 21, 2008 and October 18, 2008. All such allegations are untimely and therefore cannot provide an independent basis for damages. TriMet and Free's motion is denied, however, regarding the following conduct: (1) TriMet's disqualification of Ballard's application for the Bus Supervisor position on October 12, 2007; (2) TriMet's refusal to reinstate Ballard to full-time driving following Dr. Albright's October 22, 2008 release; and (3) TriMet's termination of Ballard on November 18, 2008.

Section 1981 Claim

> TriMet and Free's motion for summary judgment is granted with respect to Ballard's Section 1981 claims against both TriMet and Free.

Title VII and Oregon Law Race Discrimination Claim

> TriMet and Free's motion for summary judgment is denied as to the following conduct: (1) TriMet's denial of Ballard's vocational rehabilitation claim on May 2, 2008; (2) TriMet's refusal to reinstate Ballard to full-time driving following Dr. Albright's October 22, 2008 release; (3) TriMet's offer to settle Ballard's grievance arising from her termination; and (4) TriMet's November 18, 2008 personnel order deeming Ballard ineligible for rehire. TriMet and Free's motion

Page 58- OPINION AND ORDER

for summary judgment is granted with respect to all other conduct.

Ballard's amended motion for partial summary judgment (#63) is denied.  TriMet and

Free's motion for reconsideration (#95) is denied.


Dated this 7th day of April, 2011.


  /s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge